IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 07-cv-02481-PAB-KLM

PROFESSIONAL SOLUTIONS INSURANCE COMPANY,

     Plaintiff,

v.

HARRY MOHRLANG,
LENORA MOHRLANG, and
BRUCE A. MOHRLANG,

     Defendants.

_____

**ORDER**
_____

     Plaintiff Professional Solutions Insurance Company ("PSIC") filed this declaratory judgment action seeking a declaration that the language and effect of an insurance policy precludes additional payment to the defendants. The matters before the Court are PSIC's "Motion for Summary Judgment" [Docket No. 44] and the parties' joint "Notice of Submission of Case on Stipulated Evidentiary Record and Motion for Determination Based on Stipulated Record" [Docket No. 63]. Jurisdiction is premised upon diversity of citizenship in conjunction with an amount in controversy exceeding the statutory minimum under 28 U.S.C. § 1332.

## I. FACTS

### A. Factual Background

The parties do not dispute the following facts: PSIC provided professional malpractice insurance to an attorney[1] (the "Insured").  *See* Mot. for Sum. J. [Docket No. 44] ("Pl.'s Br."), Undisputed Facts ("UF") ¶ 2; *deemed admitted at* Bruce Mohrlang's Resp. to Mot. for Sum. J. ("Defs.' Resp."), Disputed Facts ("DF")[2] (noting a dispute with only three facts from the "Undisputed Facts" section of plaintiff's Motion for Summary Judgment).[3]  The Insured provided legal advice and representation on various matters to defendants Harry and Lenora Mohrlang in their individual capacities and to various trusts (the "Trusts"), for which defendant Bruce Mohrlang is now trustee.  *See* Pl.'s Br., UF ¶¶ 5, 13; *deemed admitted at* Defs.' Resp., DF.  During the same period, the Insured also provided legal services to the Mohrlangs' family business, Mohrlang Manufacturing, Inc. ("MMI").  *See* Pl.'s Br., UF ¶¶ 11, 13; *deemed admitted at* Defs.' Resp., DF.

The Insured assisted Harry and Lenora Mohrlang and the Trusts in selling nearly all of the stock in MMI.  *See* Pl.'s Br., UF ¶¶ 16, 18, 27; *deemed admitted at* Defs.'

---

[1] Pursuant to the parties' settlement agreement, the attorney is not identified by name.

[2] Because defendants Harry and Lenora Mohrlang joined in Bruce Mohrlang's response, *see* Defs. Harry Mohrlang and Lenora Mohrlang's Joinder in Resp. to Mot. for Sum. J. Filed by Bruce A. Mohrlang [Docket No. 51], they are deemed to have admitted or made all statements that Bruce Mohrlang has.

[3] *See also* Notice of Submission of Case on Stipulated Evidentiary R. and Mot. for Determination Based on Stipulated R. [Docket No. 63] ("Notice of Stipulated Evidentiary R.") ¶¶ 1-3 (noting that the parties do not controvert the evidence submitted in connection with PSIC's motion for summary judgment or perceive any conflicts therein).

Resp., DF; *id.*, Additional Material Facts ("ADM") ¶¶ 2-3.[4]  Harry and Lenora Mohrlang

and the Trusts sold their holdings in MMI to Gretchen Thomas for approximately $3.5

million to be paid incrementally under a detailed payment schedule.  *See* Defs.' Resp.,

ADM ¶¶ 1-4; *admitted at* Reply in Supp. of Mot. for Sum. J. ("Pl.'s Reply") at 1.  The

Insured helped negotiate the deal and reviewed and edited various documents

facilitating it.  *See* Pl.'s Br., UF ¶¶ 16, 18, 27; *deemed admitted at* Defs.' Resp, DF.  The

sale of MMI to Ms. Thomas closed on January 4, 2006.  *See* Defs.' Resp., ADM ¶ 7;

*admitted at* Pl.'s Reply at 1.

Ultimately, the purchaser failed to meet the payment obligations.  *See* Defs.'

Resp., ADM ¶ 8; *admitted at* Pl.'s Reply at 1.  The shortcomings of the documents that

the Insured negotiated or approved offered defendants insufficient security and

ultimately precluded them from collecting on or effectively revoking the sale of stock to

Thomas.  *See* Defs.' Resp., ADM ¶¶ 6, 8, 10; *admitted at* Pl.'s Reply at 1.  In March

2006, the Insured ceased his representation of the Trusts.  *See* Pl.'s Br., UF ¶ 39;

*deemed admitted at* Defs.' Resp., DF.

On November 1, 2002, several years before the sale of MMI to Ms. Thomas,

MMI issued a promissory note in the amount of $715,000 to Harry Mohrlang, secured

by a deed of trust on property owned by MMI.  *See* Pl.'s Br., UF ¶ 24; *admitted at* Defs.'

Resp., DF ¶ 11.  Although an early letter of intent from the eventual purchaser of the

MMI stock discussed a cash payoff of the promissory note, subsequent

---

[4] The Trusts owned 93.32%, Harry Mohrlang owned 2.46%, Lenora Mohrlang owned
2.46%, and Bruce Mohrlang owned 1.76%.  All of the stock, except Bruce Mohrlang's holding,
was transferred through the sale.  *See* Defs.' Resp., ADM ¶¶ 1-3.

correspondence and the final agreement failed to specifically address the note. *See* Pl.'s Br., UF ¶¶ 17, 24-25; *deemed admitted at* Defs.' Resp., DF.

As part of the stock sale agreement, the sellers warranted against outstanding debts and encumbrances on MMI property not specifically listed in the agreement. *See* Pl.'s Br., UF ¶ 30; *deemed admitted at* Defs.' Resp., DF. The agreement, to which Harry Mohrlang was a party, also contained a general clause releasing any and all claims the sellers had against MMI. *See* Pl.'s Br., UF ¶ 31; *deemed admitted at* Defs.' Resp., DF. Nevertheless, the purchaser and the Insured knew that the promissory note was not part of the MMI stock sale which closed on January 4, 2006. *See* Defs.' Resp., ADM ¶ 13; *admitted at* Pl.'s Reply at 1.

On January 26, 2006, the Insured caused Harry Mohrlang to sign documents releasing the $715,000 promissory note and deed of trust against MMI. *See* Defs.' Resp., ADM ¶¶ 22-23; *admitted at* Pl.'s Reply at 1. Despite Harry Mohrlang's belief that the promissory note should remain in effect, he signed the releases without reading them, relying on the Insured's incorrect assertions that he still would be entitled to payment on the note. *See* Defs.' Resp., ADM ¶¶ 20-24; *admitted at* Pl.'s Reply at 1. To date, Harry Mohrlang has not been paid the $715,000. *See* Defs.' Resp., ADM ¶ 29; *admitted at* Pl.'s Reply at 1.

The Insured served as Harry Mohrlang's and the Trusts' attorney both before and after the January 4, 2006 closing of the sale of nearly all of the MMI stock to Gretchen Thomas. *See* Pl.'s Br., UF ¶ 44; *deemed admitted at* Defs.' Resp., DF. The Insured also served as MMI's attorney both before and after the closing. *See* Pl.'s Br.,

UF ¶ 44; *deemed admitted at* Defs.' Resp., DF.  Thus, on January 26, 2006, when the

Insured caused Harry Mohrlang to sign the releases of the $715,000 promissory note

and the deed of trust against MMI, the Insured improperly represented opposing sides

in the transaction.  Pl.'s Br., UF ¶¶ 44-45; *deemed admitted at* Defs.' Resp., DF.  In

March 2006, the Insured ceased his representation of Harry and Lenora Mohrlang.  *See*

Pl.'s Br., UF ¶ 39; *deemed admitted at* Defs.' Resp., DF.

### B.  The Claims

Upon engaging new counsel, Bruce Mohrlang sent the Insured's attorney a letter

and draft complaint indicating that he intended to file a professional negligence action

on behalf of the Trusts against the Insured for the Insured's role in structuring the MMI

sale.  *See* Defs.' Resp., ADM ¶ 9; *id.*, Ex. I [*filed under seal at* Docket No. 48]; *admitted*

*at* Pl.'s Reply at 1.  Harry and Lenora Mohrlang, after engaging new counsel of their

own, sent a letter and draft complaint to the Insured's attorney indicating that they

intended to file a lawsuit against the Insured for professional negligence and breach of

fiduciary duties.  *See* Defs.' Resp., ADM ¶¶ 32-33; *id.*, Ex. J [*filed under seal at* Docket

No. 49]; *admitted at* Pl.'s Reply at 1.  According to Harry Mohrlang, he has two distinct

"claims" against the Insured under the Policy.[5]  First, Harry Mohrlang asserted a breach

of professional duties – i.e. professional negligence – by the Insured involving the sale

of his relatively small amount of MMI stock.  The second purported "claim" also involves

---

[5] Although named as a defendant in this case, Lenora Mohrlang does not appear to
assert any right to additional payment under the policy.

breaches of professional duties – fiduciary duties of loyalty, disclosure, candor, etc. – involving the release of his $715,000 promissory note.[6]

Bruce Mohrlang's "claim" on behalf of the Trusts is solely for the Insured's alleged negligence in negotiating and approving the structure of the MMI stock sale.

In October 2007, the defendants reached a settlement agreement with the Insured's insurance carrier, PSIC. *See* Pl.'s Br., UF ¶ 6; *deemed admitted at* Defs.' Resp., DF; *see also* Settlement Agreement and Release [*filed under seal at* Docket No. 37] ("Settlement Agreement"). Coverage under the Insured's PSIC malpractice policy (the "Policy") is limited to $500,000 per claim. *See* Pl.'s Br., UF ¶ 6; *deemed admitted at* Defs.' Resp. at 1. The policy also includes a $1,000,000 aggregate limit for all claims against the Insured during the Policy's one-year term.[7] *See* Pl.'s Br., UF ¶ 6; *deemed admitted at* Defs.' Resp. at 1.

### C. The Policy

The definition of a "claim" under the Policy is the pivotal question in this case. Section F of the Policy, which is entitled "How the Policy Limits Apply," contains the following relevant provisions:

Regardless of the number of:

• **you** covered by this policy;
• **claims** made; or
• Persons or entities making **claims**

_____

[6] Throughout this Order, in referring to Harry Mohrlang's claim against the Insured in connection with the release of the promissory note, I use Harry Mohrlang's characterization of the claim as one for breach of fiduciary duties. *See* Defs.' Resp., ADM ¶ 33.

[7] The amounts paid out by PSIC are in excess of the Insured's deductible minus the costs of defense. *See* Pl.'s Br., UF ¶ 4, 6-7; *deemed admitted at* Defs.' Resp., DF.

the policy limits stated in the Declarations apply as follows:

1. EACH CLAIM – The most **we'll** pay for **damages** and **claims expenses** arising from each **claim** made under this policy is the amount stated in the Declarations for Each **Claim** [i.e. $500,000].

2. ANNUAL AGGREGATE – The most **we'll** pay for all **damages** and **claims expenses** arising from all **claims** made under this policy is the amount stated in the Declarations as Annual Aggregate [i.e. $1,000,000].

Compl. for Declaratory J. [Docket No. 1] ("Compl."), Ex. 2 ("Policy") at 8.[8]  The Policy defines a "claim" as "a demand . . . **you** receive for money or services, including suit or institution of arbitration proceedings against **you**." *Id.*, Policy at 10.  In an important limitation on the term "claim," the Policy states, "If **related claims** are subsequently made against **you** and reported to **us**, all such **related claims**, whenever made, shall be considered a single **claim** . . . ." *Id.*, Policy at 8.  Therefore, "related claims" may receive a maximum $500,000 payment in total, whereas multiple claims that are not "related claims" may receive up to $500,000 each, as limited by the $1,000,000 aggregate figure.

Under the Policy, "related claims" are those "**claims** arising out of a single act or omission or arising out of **related acts or omissions** in the rendering of **professional services**." *Id.*, Policy at 10.  Finally, the Policy defines "related acts or omissions" as "all acts or omissions in the rendering of **professional services** that are temporally,

---

[8] The bold terms in the cited Policy language are found in the original and denote terms defined within the Policy.

logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision." *Id.*, Policy at 10.

The parties agree that the Insured committed acts, errors, or omissions that resulted in damages of at least $500,000 each to both the Trusts, collectively, and Harry Mohrlang, individually. *See* Pl.'s Br., UF ¶¶ 7-8; *deemed admitted at* Defs.' Resp., DF. Although the parties settled, they disagreed about whether all of the defendants' claims against the Insured qualify as "related claims." *See* Pl.'s Br., UF ¶ 6; *deemed admitted at* Defs.' Resp., DF. PSIC argues that the defendants have made "related claims" and as such may receive a maximum total payment of $500,000 under the policy terms. *See* Pl.'s Br. at 18-19. Defendants, on the other hand, assert that they do not bring "related claims" and instead may receive $500,000 per claim, up to the $1,000,000 aggregate limit.

PSIC issued payment to the defendants in the total amount of $500,000, minus the costs of defense. *See* Pl.'s Br., UF ¶ 6; *deemed admitted at* Defs.' Resp., DF; *see also* Settlement Agreement at 1-2. The parties agreed to submit for judgment the question of whether the defendants' claims qualified as "related claims" or separate claims. *See* Pl.'s Br., UF ¶ 6; *deemed admitted at* Defs.' Resp., DF. If all of the defendants' claims qualify as "related claims," then the $500,000-per-claim limit is operative and PSIC need not compensate the defendants further. If, however, the defendants have multiple claims under the Policy's terms, then each will be entitled to compensation up to the $500,000-per-claim limit, as constrained by the $1,000,000 annual aggregate limit.

### D. Procedural Background

On November 29, 2007, in accord with the settlement agreement, PSIC filed a declaratory judgment action with this Court seeking a declaration that defendants' claims are "related claims" under the Policy. *See* Compl. at 6. On August 8, 2008, PSIC filed a motion for summary judgment. *See generally* Pl.'s Br. On August 28, 2008, defendants responded, but have not made a cross-motion for summary judgment. *See generally* Defs.' Resp. On September 12, 2008, PSIC replied. *See generally* Pl.'s Reply. PSIC's motion for summary judgment is fully briefed and ripe for review.

On January 19, 2009, all parties jointly filed a notice in which they stipulated to the admissibility at trial of the exhibits presented in connection with PSIC's motion for summary judgment. *See* Notice of Stipulated Evidentiary R. ¶ 1. The parties also agree that this record comprises the full, uncontested evidentiary record in this case. *See id.* ¶¶ 1-2 ("The parties do not controvert that evidence, nor do they perceive any conflicts among the evidence submitted."). The parties seek to submit the case for determination on this stipulated record in lieu of presentation of evidence during a bench trial. *See id.* at ¶¶ 4-5 (citing *Hoxworth v. Blinder*, 74 F.3d 205, 207 (10th Cir. 1996)); *see also FDIC v. Kan. Bankers Sur. Co.*, 963 F.2d 289, 292 (10th Cir. 1992) (stating that where a court makes "solely legal determinations based on stipulated facts," for the purposes of review, it makes little difference if the court does so pursuant to summary judgment or following trial.)

## II. ANALYSIS

### A. Declaratory Judgment

#### 1. Legal Standard

"In a case of actual controversy within its jurisdiction . . . , any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a) (2006).  The preceding language of the Declaratory Judgment Act creates two separate hurdles that parties seeking a declaratory judgment must overcome.  *Surefoot LC v. Sure Foot Corp.*, 531 F.3d 1236, 1240 (10th Cir. 2008).  First, there must be an "actual controversy" at issue.  *Id.* (noting that the "actual controversy" requirement is tied to the case-or-controversy requirement of Article III of the United States Constitution).

In determining if an "actual controversy" exists, the Tenth Circuit follows the Supreme Court's recent opinion in *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118 (2007).  *See Surefoot*, 531 F.3d at 1241–47.  In *MedImmune*, the Court noted that its previous decisions

> required that the dispute be definite and concrete, touching the legal relations of parties having adverse legal interests; and that it be real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

*MedImmune*, 549 U.S. at 127 (internal quotation marks and alteration marks omitted). The Court summarized this position by stating: "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial

controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.*

Once a district court satisfies itself that an "actual controversy," and as a consequence Article III jurisdiction, exists, it turns to the second hurdle that a party seeking a declaratory judgment must overcome. This step embraces the permissive language of the Act – that a district court "*may* declare the rights and other legal relations." 28 U.S.C. § 2201(a) (emphasis added). This step requires a district court to consider several case-specific factors when deciding whether to exercise its declaratory judgment authority. *Surefoot*, 531 F.3d at 1240. These various "equitable, prudential, and policy arguments" weigh on the Court's discretionary decision to either entertain or dismiss a declaratory judgment action. *MedImmune*, 549 U.S. at 136.

The Tenth Circuit has provided a non-exhaustive list of factors for district courts to consider in this exercise: (1) whether a declaratory action would settle the controversy; (2) whether it would serve a useful purpose in clarifying the legal relations at issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race to res judicata"; (4) whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective. *State Farm Fire & Cas. Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir. 1994).

## 2. *Actual Controversy*

In determining whether the present case is properly before the Court under the Declaratory Judgment Act, I conclude that an "actual controversy" exists. The dispute qualifies as an "actual controversy" under *MedImmune*'s command that it be "definite and concrete, touching the legal relations of parties having adverse legal interests; and that it be real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune*, 549 U.S. at 127 (internal quotation marks and alteration marks omitted); *see also id.* ("Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.").

The factual basis for this case evinces a definite and concrete dispute regarding the adverse legal interests of the parties. The language of the Policy either makes PSIC liable to the defendants or not. With nearly $500,000 at stake, the dispute is real and substantial. In the end, the Court's judgment in this case will resolve the controversy by interpreting the Policy's language and determining how it applies in this instance. *Cf. Cox v. Phelps Dodge Corp.*, 43 F.3d 1345, 1348 (10th Cir. 1994), *superseded by statute on other grounds*, *as recognized in Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1159 (10th Cir. 2005) ("It is well established that what makes a declaratory judgment action 'a proper judicial resolution of a "case or controversy" rather than an advisory opinion is the settling of some dispute which affects the

behavior of the defendant toward the plaintiff.'" (quoting *Hewitt v. Helms*, 482 U.S. 755, 761 (1987) (alteration marks omitted)).  Therefore, the first hurdle for a party seeking a declaratory judgment – establishing the existence of an "actual controversy" and by extension the Court's Article III jurisdiction – has been cleared in this case.

### 3.  Discretionary Factors

As for the second, "discretionary" hurdle, I conclude that the equitable, prudential, and policy arguments weigh in favor of allowing the declaratory judgment action to proceed.  With regard to the *Mhoon* factors, I conclude that: (1) a declaratory action would settle the controversy regarding the amount PSIC is required to pay to defendants; (2) it would serve a useful purpose in clarifying the legal relations at issue by settling the meaning and effect of the Policy terms; (3) it is not being used merely for the purpose of procedural fencing or to provide an arena for a race to res judicata; (4) a declaratory action would not increase friction between our federal and state courts or improperly encroach upon state jurisdiction because no state court action is active or contemplated; and (5) no alternative remedy exists which is better or more effective. These factors, as well as the interests of judicial efficiency and in settling controversies in an expeditious manner, support my conclusion that the present declaratory action is proper and should proceed.

### B.  Summary Judgment

### 1.  Legal Standard

Federal Rule of Civil Procedure 56(c) instructs that a court should grant summary judgment where "the pleadings, the discovery and disclosure materials on file,

and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & County of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248).

### 2. Material Facts in Dispute

The material facts in this case are undisputed. The only facts that either party identifies as disputed appear in defendants' response brief. *See* Defs.' Resp. at 2-3. The disputes are regarding: 1) who wrote "paid in full" on Harry Mohrlang's $715,000 promissory note against MMI; 2) whether the Insured told Harry Mohrlang that by signing various documents he would be releasing the deed of trust; and 3) whether the Insured knew that Harry Mohrlang did not intend to release the promissory note. This case hinges on the meaning of the Policy term "related claims" and whether the Insured's structuring of the MMI sale on one hand, which harmed the Trusts, and the Insured's violation of his fiduciary duties to Harry Mohrlang on the other, qualify as "related claims." The questions presented by defendants' response brief go to the legal

effect of the purported releases, not the issues at hand. Therefore, under the applicable substantive law, they are not essential to the proper disposition of the claims in this case, and thus are not material. *See Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).

Furthermore, the parties' statements in the notice of a stipulated evidentiary record eliminate the need for a more detailed analysis regarding the facts of the case. The notice states, "The evidentiary record developed in the summary judgment briefs includes the evidence that the parties anticipate would be presented at trial. The parties do not controvert that evidence, nor do they perceive any conflicts among the evidence submitted." Notice of Stipulated Evidentiary R. ¶ 2. The facts asserted in the parties' summary judgment briefs derive directly from this uncontroverted evidentiary record. As a result, there are no disputed material facts in this case, and summary judgment will be appropriate for the party which "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

### 3. Interpretation of the Policy Terms

Where a court has diversity-based jurisdiction over a case, the laws of the forum state govern the analysis of the underlying claims. *See Essex Ins. Co. v. Vincent*, 52 F.3d 894, 896 (10th Cir. 1995). With no indication or argument otherwise, Colorado law governs the underlying claims in this case.[9]

---

[9] In fact, because the parties' briefs assume applicability of Colorado law by citing primarily to it for basic contract interpretation principles, I operate under that same assumption. *See*, *e.g.*, Pl.'s Br. at 14; Defs.' Resp. at 8; Pl.'s Reply at 2-3, 6; *see also Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").

Under Colorado law, courts interpret insurance policies using the same principles employed in contract interpretation. *Essex Ins. Co. v. Vincent*, 52 F.3d 894, 896 (10th Cir. 1995); *Hoang v. Assurance Co. of Am.*, 149 P.3d 798, 801 (Colo. 2007). Interpretation of the terms of an insurance policy, as with any contract, is a question of law to be decided by the court. *See Am. Family Mut. Ins. Co. v. Allen*, 102 P.3d 333, 340 (Colo. 2004); *see also In re Aramark Leisure Servs.*, 523 F.3d 1169, 1176 (10th Cir. 2008) (noting that where the language of an insurance policy is unambiguous under applicable state law, then interpretation of that policy as a question of law is properly determined by summary judgment). In interpreting insurance policies, courts are to give effect to the intent and reasonable expectations of the parties and to enforce the policy's plain language unless it is ambiguous. *Hoang*, 149 P.3d at 801. Policy terms defined within the document itself demonstrate the intent of the parties and, as such, govern. *Cf. Bohrer v. Church Mut. Ins. Co.*, 965 P.2d 1258, 1262 (Colo. 1998). However, "[w]hen faced with terms in an insurance policy that are not defined, Colorado law dictates that such terms be given their plain, ordinary meaning and interpreted according to the understanding of the average purchaser of insurance." *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 306 (Colo. 2003) (alteration marks omitted).

The question of whether an insurance policy term is ambiguous is also a question of law. *See State Farm Mut. Auto. Ins. Co. v. Mendiola*, 865 P.2d 909, 912 (Colo. App. 1993). Such terms are ambiguous if they are susceptible to more than one reasonable interpretation. *Hoang*, 149 P.3d at 801. In making the ambiguity

determination, courts are to view the policy as a whole, using the generally accepted meaning of the words employed. *USAA Cas. Ins. Co. v. Anglum*, 119 P.3d 1058, 1060 (Colo. 2005). Courts "may consider extrinsic evidence regarding the meaning of the written terms, including evidence of local usage and of the circumstances surrounding the making of the contract." *Pub. Serv. Co. of Colo. v. Meadow Island Ditch Co. No. 2*, 132 P.3d 333, 339 (Colo. 2006). However, courts may not consider extrinsic expressions of intent by the parties. *Id.* Furthermore, the mere fact that the parties disagree about the meaning of a provision does not in itself mean the term is ambiguous. *Snipes v. Am. Mut. Ins. Co.*, 134 P.3d 556, 558 (Colo. App. 2006).

Any ambiguities in an insurance policy that a court may encounter are to be construed against the insurer, as the drafter of the policy. *See State Farm Mut. Ins. Co. v. Nissen*, 851 P.2d 165, 167 (Colo. 1993). "However, this rule of construction against the insurer cannot be applied where the language is unambiguous and there is nothing to construe." *First Fin. Ins. Co. v. Albertson's, Inc.*, 91 P.3d 470, 472 (Colo. App. 2004) (citing *Jorgensen v. St. Paul Fire & Marine Ins. Co.*, 158 Colo. 466, 470, 408 P.2d 66, 68 (1965)).

PSIC argues that all of the Insured's acts or omissions complained of by the defendants are "related claims" under the Policy because they are temporally, causally, and logically connected by a common transaction or event, namely the sale of MMI.[10] *See* Pl.'s Br. at 18. Bruce Mohrlang seeks redress for the Insured's acts or omissions

---

[10] There is no dispute over the fact that the sale of MMI qualifies as an "event" or "transaction" and I see no reason for one, particularly in light of the fact that those terms are preceded by the broad modifier "any."

surrounding the structuring of the MMI sale.  *See* Defs.' Resp. at 14.  Harry Mohrlang

seeks redress for the Insured's breaches of fiduciary duties that occurred when the

Insured persuaded him to sign the releases of the promissory note and the deed of

trust.  *See* Defs.' Resp., AMD ¶ 33.

The critical interpretative question in this case is the meaning of the term "related

claims" in the Policy.  *See* Compl., Policy at 8 ("[A]ll such related claims, whenever

made, shall be considered a single claim . . . ." (bold typeface omitted)).  The Policy

uses two separate levels of cross-referencing in order to define "related claims."

According to the Policy "related claims" encompass "related acts or omissions," which,

in turn, are defined as "all acts or omissions . . . that are temporally, logically or causally

connected by any common fact, circumstance, situation, transaction, event, advice or

decision."  In this final level of cross-referencing, the Policy does not define "acts or

omissions . . . that are temporally, logically or causally connected by any common fact,

circumstance, situation, transaction, event, advice or decision."  Because a court is only

to interpret those claims that are not defined by the policy itself, *see Cyprus Amax*, 74

P.3d at 306, the definitions provided shall govern.  Therefore, by consolidating the

cross-referenced definitions, "related claims" under the Policy are "claims arising out of

a single act or omission or arising out of all acts or omissions in the rendering of

professional services that are temporally, logically or causally connected by any

common fact, circumstance, situation, transaction, event, advice or decision."

Colorado courts have not interpreted similar language in the past, so I interpret it

as I believe the Colorado Supreme Court would.  *See Wood v. Eli Lilly & Co.*, 38 F.3d

510, 512 (10th Cir. 1994) ("If a federal court cannot ascertain the law of the forum state,

we must in essence sit as a state court and predict how the highest state court would rule.").  The operative language in the phrase cited above is "temporally, logically or causally connected."  Because the Policy does not define these terms, if they are unambiguous, they must be given their plain, ordinary meaning so as to give effect to the intent and reasonable expectations of the parties.  *See Hoang*, 149 P.3d at 801. Because the terms "temporally connected," "logically connected," and "causally connected" are not susceptible to more than one reasonable interpretation in this context, I conclude that the language of the Policy is not ambiguous.  *Id.*

I first make some preliminary, and perhaps elementary, points.  The word "or" can be interpreted to be exclusive – i.e. allowing for only one of the listed items, *see Denver Plastics, Inc. v. Snyder*, 416 P.2d 370, 373 (Colo. 1966) – or to be inclusive – i.e. allowing any and all of the listed items, *see Atchison v. City of Englewood*, 568 P.2d 13, 18 (Colo. 1977), *superseded by statute on other grounds*, Colo. Rev. Stat. § 38-30-167 (2001), *as recognized in Brush Grocery Kart, Inc. v. Sure Fine Mkt., Inc.*, 47 P.3d 680, 683 (Colo. 2002).  The context and plain meaning of the phrase "temporally, logically or causally connected" in the Policy indicate that acts or omissions may be connected in any of the three ways, or any combination thereof.  *Cf. Atchison*, 568 P.2d at 18.

Furthermore, the provision requiring that the acts or omissions be connected "*by* any *common* fact, circumstance, situation, transaction, event, advice or decision" means that the acts or omissions must be linked to one or more shared element in the list.  Finally, I note that by naming the three types of connections that may serve to

designate two claims as "related claims," the Policy, by negative inference, precludes

other, broader types of connections from doing the same. *See Hutchinson v. Mullins*,

491 P.2d 71, 74 (Colo. App. 1971) (applying *expressio unius est exclusio alterius*, the

maxim of construction which holds that the inclusion of one item in a contract implies

the exclusion of others not listed). In other words, a merely perceivable or conceivable

connection between two acts or omissions is insufficient under the Policy's definition of

"related claims."

Therefore, for PSIC to prevail in the present case, both sets of the Insured's acts

or omissions detailed above – the imprudent structuring of the sale and the violation of

fiduciary duties – must be temporally, logically, or causally connected to the sale of

MMI. It is evident that Bruce Mohrlang's claims on behalf of the Trusts for damages

based on the Insured's structuring of the MMI sale are temporally, logically, and

causally connected to the sale of MMI. The same cannot be said for the Insured's

breaches of fiduciary duties surrounding the signing of the releases of the promissory

note and deed of trust.

### a. Temporally Connected

In common usage, "temporally connected" means connected to a particular time

or through the sequence of time. *See* Merriam-Webster's Collegiate Dictionary 1286

(11th ed. 2007) (defining "temporal" as "of or relating to the sequence of time or to a

particular time"). In other words, for two things to be temporally connected, they must

either occur at the same time or one must follow the other sequentially, that is, in a

continuous or connected series. *See id.* 1135 (defining "sequence" as "a continuous or connected series").

PSIC argues that the Insured's violation of his fiduciary duties to Harry Mohrlang is temporally connected to the sale of MMI because it was all part of a single transaction. *See* Pl.'s Br. at 18. However, the sale closed three weeks earlier than the signing of the release and the sale did not include a specific provision regarding the promissory note. Therefore, the violation did not occur at the same time as the sale.[11] However, regardless of such conflict, the Insured also breached a separate professional duty to Harry Mohrlang by misrepresenting the effect of his signing release.

PSIC also urges that the Insured's breaches of fiduciary duties was temporally connected to the MMI sale because the events of January 26, 2006 occurred in the same time frame as – the period leading up to and directly following – the sale. *See id.* at 18-19. However, whether the sale and the Insured's breaches of his fiduciary duties to Harry Mohrlang occurred in the same time frame is not the operative question under the Policy. Rather, the plain meaning of "temporally connected" requires a closer connection, either that the breaches happened at the same time or followed the sale sequentially. The Insured's breaches of his fiduciary duties to Harry Mohrlang were not in a continuous or connected series with the sale of MMI. The promissory note remained in place after the deal closed. The release of the promissory note served the purposes of MMI and its new owners going forward by extinguishing a debt that MMI

---

[11] In fact, it was not until the sale concluded that the Insured's conflict of interest arose due to the simultaneous representation of Harry Mohrlang and MMI under its new ownership.

owed.  The release did not serve the interests of Harry Mohrlang and his responsibilities under the contract of sale.  Therefore, the completion of the sale created a temporal break that separated the Insured's breaches of professional duties to the Trusts related to the sale of the stock from the Insured's breaches of fiduciary duties owed to Harry Mohrlang related to the release of the promissory note and deed of trust.

### b.  Logically Connected

In common usage, "logically connected" means connected by an inevitable or predictable interrelation or sequence of events.  *See* Merriam-Webster's Collegiate Dictionary 732 (11th ed. 2007) (defining "logic" as "interrelation or sequence of facts or events when seen as inevitable or predictable").  Therefore, for two things to be logically connected, one must attend or flow from the other in an inevitable or predictable way.[12]

PSIC argues that the Insured's violation of his fiduciary duties to Harry Mohrlang related to the signing of the release is also logically connected to the sale of MMI stock because it all constituted a single transaction.  *See* Pl.'s Br. at 18.  PSIC supports this argument by asserting that the parties had originally intended for the promissory note and deed of trust to be part of the sale of MMI.  *See* Pl.'s Reply at 7.  However, it is

---

[12] I am unpersuaded by PSIC's contention that the court should adopt the definition of "logically related" as developed in the "logical relationship test" which determines whether a counterclaim is compulsory under the Colorado Rules of Civil Procedure.  *See McCabe v. United Bank of Boulder*, 657 P.2d 976, 978 (Colo. App. 1982) (claims and counterclaims are "logically related" to the same subject matter where they arise out of the same "aggregate of operative facts" or "a common factual matrix"); *Allen v. Martin*, --- P.3d ----, 2008 WL 2372277, at *4-5 (Colo. App. June 12, 2008) (not yet released for publication).  The "logical relationship test" serves the purpose of avoiding a multiplicity of lawsuits, *see McCabe*, 657 P.2d at 978, rather than the interpretive goal of enforcing the plain meaning of contract terms.

irrelevant what the parties may have at one time contemplated; the fact is that the promissory note was not specifically accounted for by the final sale agreement. Moreover, Harry Mohrlang's promissory note and the deed of trust were not affected by the stock sale. The promissory note was an independent obligation of MMI. Although the stock sale caused the Insured's loyalties to shift and ultimately gave him the motive to seek Harry Mohrlang's release of the promissory note, the fact that the Insured caused Harry Mohrlang to sign the release is in no way an inevitable or predictable outcome of the sale.

### c. Causally Connected

In common usage, "causally connected" means connected where one person or thing brings about the other. *See* Merriam-Webster's Collegiate Dictionary 196 (11th ed. 2007) (defining "cause" as "something that brings about an effect or a result"). Therefore, for two things to be causally connected, one must bring about the other. Moreover, the common understanding of causation requires more than a "but-for" relationship between two things – if not for the first thing, the second would not have occurred. Rather, it describes a situation where the first thing leads to the second in a direct and traceable way, and where no independent, significant thing interrupts the causal chain between the two.

Even the narrowest interpretation of "causation" in the context of an insurance policy requires "something more than a mere 'but for' relation." *State Farm Mut. Auto. Ins. Co. v. Kastner*, 77 P.3d 1256, 1263 (Colo. 2003) (interpreting automobile insurance policy's statute-based phrase "arising out of the use" to include a causal component

requiring that the alleged cause be directly related or inextricably linked to the result, so that no independent significant act or omission interrupted the but-for causal chain.) And while the court in *Kastner* held that the necessary causal connection in that context amounted to "something less than proximate cause in the tort sense," *id.*, in other contexts, Colorado courts incorporate the concept of proximate cause in interpreting insurance policies. *See*, *e.g.*, *In re Estate of Heckman*, 39 P.3d 1228, 1231-32 (Colo. App. 2001) (holding that the phrase "directly and independently of all other causes" means the "predominant cause" or "the active, efficient, dominating, originating, or direct proximate cause"); *Novell v. Am. Guar. & Liab. Ins. Co.*, 15 P.3d 775, 778 (Colo. App. 1999) ("Under an all-risk policy, once the insured demonstrates a loss to the property covered by the policy, the insurance carrier has the burden of proving that the proximate cause of the loss was excluded by the policy language."). As a further consideration, the Policy at issue in the present case was for professional malpractice. A component of a professional malpractice claim in Colorado is that, by breaching the duty of care to his or her client, the attorney proximately caused damages to that client. *See Hopp & Flesch, LLC v. Backstreet*, 123 P.3d 1176, 1183 (Colo. 2005).

Therefore, Colorado case law supports my conclusion that a causal connection as expressed in the Policy requires more than just a but-for connection. While it is not entirely clear that the "reasonable foreseeability" that characterizes proximate cause, *see* Colo Jury Instr., Civil § 9:21 (4th ed. 2007), is the standard, it is clear that there exists no "causal connection" where an independent, significant act breaks the causal chain between two elements.

PSIC first argues that Harry Mohrlang's claim is causally connected to the sale of MMI because, if the sale had not occurred, Harry Mohrlang would not have suffered any harm. *See* Pl.'s Reply at 7. To this end, PSIC asserts that the acts and omissions about which Harry Mohrlang complains constituted a single transaction and "arose from [the Insured's] efforts to complete the sale of MMI." *Id.* at 7-8. This argument is not borne out by the facts. When the Insured caused Harry Mohrlang to release the promissory note, the sale had already been completed, and Harry Mohrlang still had an "outstanding . . . separate, good, and secured claim" in the promissory note. *See* Pl.'s Br., UF ¶ 29; *deemed admitted at* Defs.' Resp., DF.

Therefore, the sale of MMI did not directly or traceably – and certainly did not foreseeably – lead to the Insured's violation of his fiduciary duties to Harry Mohrlang.[13] Even under the narrower interpretation of "causally connected," followed by the Court here, the sale of MMI stock was not the cause of the Insured's act or omission underlying Harry Mohrlang's claim. Rather, the independent decision by the Insured, influenced by the interests of the new owners of MMI, was an independent, significant interruption to the causal chain between the sale and the Insured's breaches of his fiduciary duties to Harry Mohrlang. Therefore, although the sale of MMI may have created a conflict between Harry Mohrlang's and MMI's interests, it did not cause the Insured to breach his fiduciary duties to Harry Mohrlang concerning the promissory note in a direct and uninterrupted way.

---

[13] Instead, to the extent that reasonable foreseeability of the outcome is the applicable standard, the foreseeable outcome of the MMI stock sale would have been for the Insured to either continue to protect his client Harry Mohrlang's interests or to immediately withdraw as his attorney.

In conclusion, the Insured's breaches of the fiduciary duties owed to Harry Mohrlang are not temporally, logically, or causally connected to the sale of MMI. As a result, the acts or omissions to which these breaches amount are not temporally, logically, or causally connected by any common fact, circumstance, situation, transaction, event, advice, or decision to the Insured's acts or omissions in structuring the sale of MMI. Therefore, the claim that Harry Mohrlang brought against the Insured and the claim that Bruce Mohrlang brought on behalf of the Trusts are not "related claims" under the Policy.[14] Consequently, recovery by the defendants under the Policy is not limited to a single $500,000 maximum payment, but rather to a maximum payment of $500,000 per claim, as constrained by the $1,000,000 annual aggregate limit.

### 4. Summary Judgment in Favor of Non-moving Party

"[A] court can grant summary judgment to a nonmoving party so long as the losing party had adequate opportunity to show whether there exists a genuine issue of fact or whether its opponent is entitled to judgment as a matter of law." *Sweger v. Texaco, Inc.*, 930 F.2d 35 (10th Cir. 1991) (unpublished table opinion) (citing *Pueblo of Santa Ana v. Mountain States Tel. & Tel. Co.*, 734 F.2d 1402, 1408 (10th Cir. 1984), *rev'd on other grounds*, 472 U.S. 237 (1985); *see also* Wright, Miller & Kane, Federal Practice & Procedure § 2720 (3d ed. 2008) ("The weight of authority . . . is that

---

[14] However, to the extent that a portion of Harry Mohrlang's claim included breaches of professional duties related to the sale of his MMI stock, such portion is a "related claim" to the Trusts' claims under the Policy.

26

summary judgment may be rendered in favor of the opposing party even though the opponent has made no formal cross-motion under Rule 56.").

In the present case, the parties have stipulated to the evidentiary record as presented by the parties in connection with PSIC's Motion for Summary Judgment. *See* Notice of Stipulated Evidentiary R. ¶¶ 1-3. As a result, PSIC has had an adequate opportunity to show whether there exists a genuine issue of fact and whether the defendants are entitled to judgment as a matter of law. PSIC has stipulated to the evidentiary record as it currently exists, and as such, no material facts in the case are in dispute.

"Summary judgment is appropriate if the evidence is such that no reasonable jury could return a verdict for the nonmoving party." *Zurich Am. Ins. Co. v. O'Hara Reg'l Ctr. for Rehab.*, 529 F.3d 916, 920 (10th Cir. 2008) (quoting *Cudjoe v. Indep. Sch. Dist. No. 12*, 297 F.3d 1058, 1062 (10th Cir. 2002)). In the context of considering whether summary judgment should be granted to the defendants, PSIC is deemed to be the nonmoving party. In light of the legal conclusions of this Court, no reasonable jury could find that Bruce Mohrlang's claim and Harry Mohrlang's claim are "related claims" under the Policy. Therefore, defendants are entitled to judgment as a matter of law, and summary judgment will be entered in favor of the defendants.

## III. CONCLUSION

Although there are no genuine issues as to the material facts in this case, the terms of the Policy at issue preclude summary judgment as a matter of law for the moving party, plaintiff PSIC. Furthermore, because PSIC has stipulated to the

evidentiary record presented in connection with its motion for summary judgment, has declined to assert a genuine issue of material fact, and has had ample opportunity to contest whether the defendants are entitled to judgment as a matter of law, I conclude that summary judgment is appropriate for the defendants as nonmoving parties.

Because all parties have stipulated to the factual record going forward, judicial economy and the purposes underlying Rule 56 in expediting the disposition of cases where warranted militate in favor of the granting of summary judgment in favor of the defendants. *See Wilder v. Prokop*, 846 F.2d 613, 626 (10th Cir. 1988) ("The purpose of Rule 56 is to permit expeditious disposition of cases in which there is not a substantial issue of fact.").

Therefore, it is

**ORDERED** that plaintiff PSIC's motion for summary judgment [Docket No. 44] is DENIED. It is further

**ORDERED** that summary judgment in favor of defendants is GRANTED. It is further

**ORDERED** that the parties shall inform the Court of how they wish to proceed with respect to damages. Unless an agreement is otherwise reached by all parties, defendants shall file a brief detailing the damages sought and bases for such a

calculation within 20 days of the day this Order is signed.  Plaintiff shall file a response within 15 days of the day defendants' brief is filed by the Court.

DATED February 10, 2009.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge